IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSE MANUEL PEREZ,

       Plaintiff,                  No. CIV S-06-2090 MCE GGH P

    vs.

D.K. SISTO, et al.,                 <u>ORDER</u> &

       Defendants.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

<u>Introduction/Background</u>

        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment, filed on October 7, 2009 (docket # 61), by defendants Lozano, Cantu, Cortez and Williams, to which plaintiff filed his opposition on November 3, 2009 (docket # 65), along with a copy of defendants' interrogatory responses (docket # 66), after which defendants filed their reply on November 10, 2009 (docket # 68).  Also pending are three motions by plaintiff: (1) a motion for sanctions, filed on December 29, 2009 (docket # 69); (2) a motion for clarification, filed on December 30, 2009 (docket # 70); and (3) a motion to treat defendants' failure to oppose the motion for sanctions as non-opposition to that motion, filed on April 5, 2010 (docket # 72).

        Court records indicate that this action originated on September 14, 2006, in the

1

1    Northern District, from which it was transferred by order filed in this court on September 20,

2    2006 (docket # 1).  Following this court's order, filed on April 6, 2007 (docket # 5), dismissing

3    the vast majority of the defendants named in the original complaint, but granting plaintiff leave

4    to amend, plaintiff filed an amended complaint on May 4, 2007 (docket # 7).  The court found

5    that plaintiff had made cognizable claims in the amended complaint as to defendants Lieutenant

6    (Lt.) Lozano; Lt. B.C. Roszko; Lt. Sandy; Sergeant (Sgt.) Orrick; Sgt. Flete; Sgt. Durfey; Sgt.

7    C.L. Williams; Correctional Officer (C/O) Cantu; and C/O Cortez.  See order, filed on October

8    23, 2007 (docket # 9).

9            Subsequently, by order filed on February 19, 2009 (docket # 38),[1] the motion to

10   dismiss filed by defendants Durfey, Flete, Orrick,  Roszko, and Sandy was granted; these

11   defendants were dismissed, and the matter was to proceed only as to the previously answering

12   defendants.  Thus, the matter proceeded at that point only as to defendants Cantu, Cortez and

13   Williams.  Thereafter, however, following the court's show cause order why defendant Lozano

14   should not be found in default (see order, filed on January 8, 2009 (docket # 30)), the court in a

15   January 26, 2009, order (docket # 32), found Lozano's response discharged the show cause order

16   and determined that defendant not to be in default; the court also deemed defendant Lozano's

17   answer filed as of January 26, 2009.   Therefore, there are four defendants who remain and who

18   bring the instant summary judgment motion: Lozano, Cantu, Cortez and Williams and only

19   allegations related to those defendants remain at issue.

20   Summary of Amended Complaint

21           In the remaining allegations, plaintiff alleges violations of his rights under the

22   Eighth Amendment for defendants' failure to protect him, for inadequate medical care, and for

23   the use of excessive force.  Plaintiff, an inmate from Puerto Rico, alleges that defendant Williams

24   repeatedly ignored his safety concerns about being housed with a self-identified Northern inmate

25   _____

26       [1] Adopting findings and recommendations, filed on January 8, 2009 (docket # 30).

2

from mid-October 2005, until February 2, 2006.  In addition, defendant Williams, according to plaintiff, exacerbated the situation by yelling about his complaint at plaintiff in a manner that could be overheard by other inmates more than once.  On February 2, 2006, defendant Williams yelled to the effect that plaintiff wanted to have black inmates moved from their cells, after which an inmate named Socorro approached him about what he had overheard and plaintiff was later attacked by this individual.  Plaintiff was treated and reportedly had an elbow scrape.

When plaintiff was in the holding cage with restraints, plaintiff complained of his pain and discomfort to defendant Cortez, who ignored plaintiff's requests to loosen the cuffs. After plaintiff began to kick his cage, the too-tight cuffs were removed.  Defendant Cortez then ignored plaintiff's request to be taken to the clinic for a wrist injury from the handcuffs.

When plaintiff began to kick the holding cage again for attention, defendant Lozano ran in and threatened plaintiff with a can of O.C. [pepper] spray, but refused plaintiff's request to be seen by medical.  Fifteen minutes later, defendants Cortez and Cantu came and told plaintiff to "cuff up" for an escort to medical, but instead they led plaintiff to Ad Seg.[2]  When plaintiff stopped to ask why, defendants Cantu and Cortez took him down using excessive force from which plaintiff suffered injuries in addition to the previous wrist injury from the cuffs. Plaintiff seeks primarily money damages.  Because his allegations against defendants Orrick and Flete have been dismissed, his limited reference to a form of injunctive relief having to do with constraining the future actions of these parties has been rendered moot.  See Amended Complaint (AC), pp. 5, 8-17.

Plaintiff's Motions

*Motion for Sanctions*

Plaintiff asks that defendants' motion for summary judgment be denied because plaintiff failed to be served timely with defendants' motion for a five-day extension of time to

---

[2]  Administrative Segregation.

3

1   file their dispositive motion.  Plaintiff maintains that he received a copy of the October 3, 2009,

2   order granting defendants the additional five days to file their motion for summary judgment

3   before he received any notice of the motion.  Plaintiff states that he only received a copy of the

4   motion after filing an ex parte letter to Judge England.  The letter he references was docketed on

5   October 13, 2009 (doc. # 64).  Absent an express waiver of service, plaintiff is correct that the

6   parties are obligated to serve documents they file upon all parties, including upon a pro se party.

7   Local Rule 135(d) and (e); see also, Fed. R. Civ. P. 5.  The copy of the motion plaintiff attaches

8   to the instant motion, filed on December 29, 2009 (doc. # 69) as well as the original request

9   itself, filed on September 25, 2009 (doc. # 59), contains a proof of service indicating that plaintiff

10  was served with the request on September 25, 2009.   Like most, if not all, such requests made by

11  the Attorney General's Office, the supporting declaration states that as plaintiff is a pro se

12  inmate, he cannot reasonably be contacted prior to making the request.  Declaration of Rebecca

13  Armstrong-Grau, Doc. # 59, ¶ 6.  The request was the only extension of time sought for the filing

14  of the summary judgment motion and was primarily based on a delay in locating a video-taped

15  interview in support of the motion.  See, id., ¶¶ 3, 5.  In his motion for sanctions, plaintiff does

16  not assert an objection predicated on the basis for the request, only contending that defendants

17  should be sanctioned for failing to serve him with the request, an objection which is belied by the

18  representation, under penalty of perjury, that he had, indeed, been properly and timely served.  It

19  is unknown why the document did not reach him sooner, but in any event, the court finds that

20  plaintiff's not having received it timely, or even if it did not reach him at all at the prison until he

21  filed a letter about it, does not constitute a basis for sanctioning the defendants by having their

22  summary judgment motion summarily denied.  This motion will be denied.  Also denied is

23  plaintiff's April 5, 2010 (doc. # 72), motion to treat defendants' failure to oppose his motion for

24  sanctions as non-opposition to the motion.

25                    *Motion for Clarification*

26          By this motion, plaintiff asserts that he did file objections to the August 25, 2009

4

1    (doc. # 53), findings and recommendations of the undersigned, recommending denial of

2    plaintiff's motion, pursuant to Fed. R. Civ. P. 54(b), for the order dismissing several defendants

3    to be certified as a final judgment for appeal, which was adopted by order, filed on Nov. 6, 2009.

4    (doc. # 67).  The November 6, 2009, order states that neither party filed objections, but plaintiff

5    in the instant motion attaches a document which is entitled "objection to magistrate judge's

6    findings and recommendations filed 8/25/09"; the attached filing also has a certificate of service

7    indicating that it was filed/served on September 16, 2009.  Unfortunately, there is no record in

8    the docket of this case that those objections were ever filed, other than belatedly as attached to

9    this motion for clarification.

10             Within the attached objections that were not filed in this court when plaintiff

11   insists that they were, plaintiff, inter alia, contends that defendant Lozano had failed to respond

12   to his discovery requests.  It is unclear in the filing if plaintiff is intending to say that Lozano had

13   not filed discovery responses by September 16, 2009, or as of late December, 2009.  The

14   appropriate procedure if he was seeking discovery responses from defendant Lozano would be to

15   bring a motion to compel discovery, not to bury his observation among the grievances he listed in

16   his September 16, 2009, objections which the court did not receive timely, and which still do not

17   appear as separately filed in the case docket.  Nor does he ask the court therein to direct

18   defendant Lozano to file responses to plaintiff's discovery requests, seeking rather that he be

19   found to be in default for his failure to timely respond to the complaint as well as his failure to

20   respond to discovery.  However, plaintiff's focus in the objections was to be permitted to proceed

21   on appeal as to the previously dismissed defendants.  Moreover, at no point does plaintiff clarify

22   when his discovery requests were served upon defendant Lozano.  And, as noted above, the court

23   had previously found defendant Lozano not to be in default.  See also, discussion below

24   regarding defendant Lozano.  Construing plaintiff's motion for clarification primarily as a motion

25   to be allowed to have his objections to the August 25, 2009 (doc. # 53), findings and

26   recommendations which were only belatedly received almost two months after the order adopting

1  those findings and recommendations had been signed and filed, the motion is denied.

2  Motion for Summary Judgment

3          Defendants move for summary judgment as to all claims contending that no

4  defendant violated plaintiff's constitutional rights, and they are entitled to qualified immunity

5  because there was no constitutional right violated and defendants acted reasonably.  Motion for

6  Summary Judgment (MSJ), pp. 1-13.

7                    *Legal Standard for Summary Judgment*

8          Summary judgment is appropriate when it is demonstrated that there exists "no

9  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

10  matter of law."  Fed. R. Civ. P. 56(c).

11          Under summary judgment practice, the moving party

12          always bears the initial responsibility of informing the district court
           of the basis for its motion, and identifying those portions of "the
13          pleadings, depositions, answers to interrogatories, and admissions
           on file, together with the affidavits, if any," which it believes
14          demonstrate the absence of a genuine issue of material fact.

15  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

16  P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

17  issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

18  depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

19  should be entered, after adequate time for discovery and upon motion, against a party who fails to

20  make a showing sufficient to establish the existence of an element essential to that party's case,

21  and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

22  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

23  necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

24  should be granted, "so long as whatever is before the district court demonstrates that the standard

25  for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

26  2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On November 26, 2007 (doc.# 11), the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

### *Defendant Williams*

Plaintiff makes the following specific allegations relating to defendant Williams within his verified amended complaint.  After being subjected to what he alleges was a "trump[ed] up" sexual harassment charge, plaintiff, a Viet Nam vet under psychiatric care was placed in Ad Seg in early September of 2005; on September 8, 2005, plaintiff was seen by the ICC[3] committee and to be released to yard II, "the main line," pending approval; otherwise, he would go to yard I.  AC, pp. 5, 8.

While on yard I, plaintiff, who is from Puerto Rico and a 57-year-old with no gang affiliation, was housed with an inmate from Central America, also classified as "other."  AC, p. 8.  When plaintiff's cellmate was moved on October 3, 2005, plaintiff learned he was to be housed with a "Northern" inmate in Building 2, and he voiced his safety concerns but was only given the choice of moving in with the Northern inmate or going to Ad Seg, the latter of which he chose for safety reasons (alternatively, he was placed in Ad Seg for refusing to cell with the inmate).  Id., at 9-10.  Plaintiff alleges that inmates are housed according to their affiliation, thus,

---

[3] Institutional Classification Committee.

a Northern Mexican is not housed with a Southern Mexican; therefore, he believes the planned

cell assignment amounted to an Eighth Amendment violation for failure to protect.  Id.

On October 4, 2005,[4] it was determined that plaintiff could be released to yard II;

nevertheless, he was forced either to remain on yard I or go back to Ad Seg.  AC, p. 10-11.

From mid-October 2005, until February 2, 2006, plaintiff repeatedly spoke with defendant

Williams asking her to rehouse him with another cellmate or send him back to yard II, which

requests Williams ignored.  AC, p. 11.  In mid-January of 2006, when defendant Williams was

asked by non-defendant Associate Warden Crawford, after plaintiff had spoken to her (Crawford)

about his situation, Williams yelled at plaintiff: "What are you doing going over my head to the

A.W. about this bullshit?"  Id., at 11-12.  When in response to her question, plaintiff gave

defendant Williams the name of the cellmate about whom he was concerned, Duran T-63911,

Williams became more upset, yelling in a voice other inmates could overhear: "Get out of here

and quit dropping peoples[']names trying to fuck up their program."  Id., at 12.

On February 2, 2006, he approached defendant Williams again, asking that

inmates be compacted to free up a cell, where there were four cells with one inmate only in each,

so that he could be housed with someone else also designated "other."  AC, p. 12.  Defendant

Williams became upset again, yelling: "So now you want to fuck the blacks out of their cell.  Just

for you."  Id.  Plaintiff noticed a number of black inmates looking at him at that point, and, later

that day, Inmate Socorro, E-99222, approached him about what he had overheard defendant

Williams saying about plaintiff trying to have black inmates moved from their cells, knocked

plaintiff down and ran off.  Id., at 12-13.  As plaintiff waited for an unlock, he was again

approached by Inmate Socorro, who had two other inmates with him.  Id., at 13.  Plaintiff was

attacked by the inmates, or at least by Inmate Socorro, and C/O[5] Henderson (not a defendant) saw

---

[4]  In his opposition, plaintiff identifies the date as Oct. 5, 2005.  Opp. to MSJ, p. 4.

[5]  Correctional Officer.

9

1  what was happening and put the yard down.  Id.  Plaintiff was taken to medical in handcuffs; he

2  was reported to have an elbow scrape.  Id.

3          Plaintiff was placed in a 4x4x6 cage and, a few minutes later, escorted to be

4  interviewed by non-defendant Lieutenant (Lt.) Herrera.  AC, p. 13.  After defendant Williams

5  came in and whispered to Herrera, Herrera told plaintiff he had intended to release him back to

6  the yard, but because of defendant Williams' information, plaintiff would be placed in Ad Seg

7  for his safety.  Id.  Plaintiff was told by Lt. Herrera on February 8, 2006, that the information

8  provided by defendant Williams about plaintiff's safety was not credible.  Id., at 15.

9          Defendants move for summary judgment as to defendant Williams, contending

10 that to the extent that plaintiff claims entitlement to alternate housing, as a matter of law the

11 claim fails because inmates have no constitutional right to housing in a particular prison or

12 facility.  MSJ, Docket # 61-1, pp. 2, 5-6.  In addition, defendants argue that plaintiff cannot show

13 that Williams failed to protect him from an inmate attack because he does not offer evidence she

14 acted with sufficient culpability, that at most, there was only a mere suspicion of such an attack,

15 and that she attempted to rehouse plaintiff.  Id., at 2, 6-8.

16          *Eighth Amendment Legal Standard-Failure to Protect*

17          "'[P]rison officials have a duty...to protect prisoners from violence at the hands of

18 other prisoners.'"  Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970, 1976 (1994).  "[A]

19 prison official violates the Eighth Amendment when two requirements are met.  First, the

20 deprivation alleged must be, objectively, 'sufficiently serious'....  For a claim (like the one here)

21 based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions

22 posing a substantial risk of serious harm."  Id. at 834, 114 S.Ct. at 1977.  Second, "[t]o violate

23 the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable

24 state of mind' ... [T]hat state of mind is one of 'deliberate indifference' to inmate health or

25 safety."  Id.  The prison official will be liable only if "the official knows of and disregards an

26 excessive risk to inmate health and safety; the officials must both be aware of facts from which

1    the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

2    the inference." Id. at 837, 114 S.Ct. at 1979.

3              It is undisputed that plaintiff alleges that defendant Williams, as well as the other

4    defendants, violated his Eighth Amendment rights.  Because plaintiff does not take issue with the

5    following, and the evidence cited by defendants supports these facts, at least as they are framed

6    by the undersigned, the court finds it undisputed that plaintiff admits that much of his safety

7    concerns stem from his "case factor" as a sex offender, which puts his "life in danger every

8    day"[6]; that defendant Williams does not recall that plaintiff ever provided her with the necessary

9    documentation for a bed move or for a cellmate reassignment; that although she is not

10   responsible for making the racial or ethnic classifications, defendant Williams believed plaintiff's

11   cellmate assignment was safe and appropriate; and that plaintiff sustained a scrape to his elbow

12   following the incident involving Inmate Socorro.

13             Plaintiff does not attempt to take issue within his PDF with DUF # 9 that although

14   it could take some time, defendant Williams told plaintiff that if he could find a compatible

15   cellmate of his choosing, and submit the chrono for approval, she would approve the bed move if

16   it was an appropriate cellmate assignment.  MSJ DUF Williams' Dec., Doc. # 61-2, p. 3, citing

17   ¶¶ 5, 10 and plaintiff's Dep.  45:1-15; 46:12-25-47:1-3.  Although it should not be the court's

18   burden to ferret out support for disputing defendants' undisputed facts when plaintiff does not

19   identify such evidence clearly and appropriately,[7] the undersigned finds that the record shows

20   plaintiff testified at his deposition that when he told defendant Williams that he had found a

21

22             [6]   Plaintiff admits as much when, in attempting to dispute another DUF, he states that
     defendant Williams knew or should have known, as a seasoned C/O, of the threat to inmates arising
23   from case factors and that inmates classed as "Northern" are known for assaulting inmates with
     plaintiff's case factors.  Opp., plaintiff's disputed facts (PDF), Doc. # 65-3, p. 3.

24             [7]   It is unclear to the undersigned what rules of procedure on summary judgment are
     applicable to litigants appearing pro se.  See Richardson v. Runnels, 594 F.3d 666 (9th Cir. 2010),
25   a case in which the pro se plaintiff not only failed to supply documents required by the local rules,
     but more importantly, failed to tender any evidence on the facts he desired to controvert.  However,
26   these deficiencies were not important to the Richardson court.

compatible cellmate, she told him more than once that no cells were available.   Plaintiff's Dep.:

47:15-19, 48:8-24.  He also sets forth in his declaration that "[t]he only time Sgt. Williams

ask[ed] [him] to submit a cell change slip was in mid-January of 2006 and when I did submit one

no cell change took place."  Opp., plaintiff's Dec., Doc. # 65-2, ¶ 6.  On the other hand,

defendant Williams also, according to plaintiff, when he approached her about changing cells

alternated between "blow[ing] up" and saying "Look, you know, find yourself a cell partner, you

know, and find who you are compatible with, and we'll see what we can do...."  Plaintiff's Dep.:

49: 3-8.  Plaintiff attempts to take issue with other of the undisputed facts defendants (DUF) set

forth with regard to plaintiff's claim against her.  Plaintiff does not actually dispute DUF # 2,

wherein it is stated that plaintiff claims that defendant Williams violated his rights under the

Eighth Amendment by failing to provide him with a bed move, and by having yelled statements

at him regarding his request to displace black inmates from their assigned cell but seeks to make

clear that his claim is one for failure to protect him when he sought to have himself reassigned

another cellmate.  Defendants DUF # 2, Doc. # 61-2, citing AC, ¶ 6, Plaintiff's Opp., plaintiff's

disputed facts (PDF), Doc. # 65-3, p. 2, citing AC, p. 3f:17-20.  As to DUF # 7, plaintiff does not

dispute that he had three or four conversations with defendant Williams between October, 2005,

and February, 2006.  Nor does he dispute that his assigned cellmate stated he was a "Northerner,"

while he, plaintiff, was classified as an "Other."  However, he takes issue with the

characterization that his request for a bed move was because he was "uncomfortable" with his

assigned cellmate, asserting that more than feeling simply uncomfortable that he was "fearing for

[his] life."  Opp. PDF, Doc. # 65-3, p. 2; see also, Doc. # 65-1, p. 8.  Both defendants and

plaintiff cite portions of plaintiff's deposition in support of their characterizations.  Defendants

cite plaintiff's Dep.: 43: 7-25, 44: 12-25; plaintiff's cites his Dep. 39:11-25, 40:12-23, 41, 44:14-

25.  It appears that plaintiff in describing what he conveyed to defendant Williams used both

terms, e.g. "I kept telling her that I didn't feel safe in there.  That I was not comfortable being in

there with this guy.  He's a Northerner."  Plaintiff's Dep.44:15-17.  Plaintiff's point is that use of

the word "uncomfortable" diminishes the sense of urgency or fear he apparently felt and tried to convey (whether the fear was justified or not).  In essence, however, DUF #7 is essentially undisputed.

Interestingly, at DUF # 8, defendants only cite defendant Williams' declaration in support of their assertion that during conversations with plaintiff, she assured him that his cellmate shared his same classification, which was "Other."  Doc. # 61-2, p. 2, citing Declaration of C. Williams (Williams Dec.), Doc. # 61-7, ¶ 5.  Plaintiff, in attempting to dispute this assertion, states that defendant Williams never told him that the inmate at issue, named Duran, was classified as an "Other," and that other than her declaration, there is no evidence to support her claim and no written documentation is provided in support of it.  Doc. # 65-3, p. 2.  Although not noted by defendants, however, plaintiff's contention is undermined by his own deposition testimony.  Describing his conversations with defendant Williams, plaintiff states:

> But I continuously from October, after I was put on their Ad Seg, I asked her if I could get moved out of that cell because I was housed with Duran.  Apparently, she knew Duran because she kept saying, "Oh, no he's an 'Other.'  He's fine."  I said, "no, he isn't.  We are having problems.  I don't feel safe in there.  I would like to get moved out of there."

Plaintiff's Dep. 39:18-24.

> "I told her him and I aren't clicking.  I didn't think we were compatible.  Even though she kept saying he's a Northerner – I mean, he's an "Other," the guy is not an "Other," he's a Northener.  You know what I mean?  And I wanted out of there.

Id., 44:21-25.

The court, therefore, finds it undisputed that, whether true or not, defendant Williams did tell plaintiff that Inmate Duran was classified as an "Other."   Plaintiff attempts to dispute that DUF # 10, which sets forth that beyond his general feelings of discomfort with his cellmate at the time, plaintiff never informed defendant Williams of a specific threat to his personal safety, it is at this point that plaintiff makes his argument that defendant Williams should have known he was at risk due to his case factors and being housed with a "Northerner."

13

1   MSJ DUF, Doc. # 61-2, citing Williams Dec., Doc. # 61-7 ¶ 6; see also footnote 6.  This

2   statement does not really counter defendants' undisputed fact as framed.  Plaintiff produces no

3   substantive evidence in his opposition that Inmate Duran ever threatened him directly or

4   indirectly by any action he took or even in speaking to him.  Defendant Williams denies any

5   knowledge of plaintiff's case factors as not relevant to her job duties in her response to plaintiff's

6   interrogatories.  Opp., Doc. # 66, pp. 59-60.  Plaintiff finds this response inherently not credible

7   based on her alleged relationship with defendants who have been dismissed.

8          In DUF # 14, it is stated that on February 2, 2006, plaintiff was involved in a

9   physical altercation with an inmate that was not his cellmate.  MSJ DUF, Doc. # 61-2, p. 3, citing

10  AC ¶ 6.  Plaintiff disputes the description of his encounter with Inmate Socorro as a physical

11  altercation between them, maintaining that all along he has claimed that he was

12  attacked/assaulted by this inmate.  Opp., PDF, Doc. # 65-3, p. 3.  Reference to his verified

13  amended complaint, cited by defendants in support of this assertion, reveals that plaintiff first

14  alleges that Socorro argued with him about what he had overheard defendant Williams shout at

15  plaintiff concerning inconveniencing black inmates, then hit plaintiff  knocking him to the

16  ground.  AC, p. 13 (¶ 6).  Thereafter, after first running off, he returned with two other inmates,

17  challenging plaintiff to a fight.  Id. at 14.  When plaintiff tried to walk away, Socorro told him to

18  follow him to the front of the building and when plaintiff did, he "was forced to defend

19  [him]self" from an attack by the inmates, after which a C/O Henderson put the yard down.  Id.

20  Plaintiff was cuffed up and taken to medical for a CDC 7210 medical report, which indicated he

21  had sustained a scrape to the elbow.  Id.  What remains wholly undisputed is that the incident did

22  not involve the cellmate about which plaintiff was so concerned.  As to whether the incident is

23  described as a physical altercation or an attack on plaintiff, defendant does not provide any

24  evidence that plaintiff in any way incited the incident, thus plaintiff has raised a genuine issue of

25  material fact as to whether or not the incident took place solely as a result of whether or not

26  yelling by defendant Williams that plaintiff was trying, solely for his own convenience, seeking

1   to disturb cell arrangements for the African American inmates.  Of course, defendant Williams

2   denies this, declaring that the February 2006, conversation she had with plaintiff did not involve

3   any yelling or intent to jeopardize his safety and that all she did was provide him with the

4   instructions necessary to obtain a bed move and that she would do what she could to facilitate

5   such a move.  MSJ, Opp. Williams Dec., Doc. # 61-7, ¶ 10.  Both parties make their assertions

6   under oath.  It is not for this court to make a credibility determination on a motion for summary

7   judgment.  Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1036 (9th Cir.  2005)("[I]t

8   is axiomatic that disputes about material facts and credibility determinations must be resolved at

9   trial, not on summary judgment.") [internal citation omitted].

10              To the extent that plaintiff alleges that defendant Williams put him at risk by

11   failing to provide him with another cellmate assignment, or even to facilitate a re-assignment

12   after plaintiff had, according to him, located a new and compatible cellmate, plaintiff does not

13   raise a genuine material issue of fact.  Defendants are correct that plaintiff does not have a

14   constitutional right to demand particular housing.  MSJ, Doc. # 61-1, p. 5.  Generally, prison

15   officials' housing and classification decisions do not give rise to federal constitutional claims.

16   See Board of Regents v. Roth, 408 U.S. 564, 569, 92 S. Ct. 2701 (1972).  Nor does the

17   Constitution guarantee a prisoner placement in a particular prison or protect an inmate against

18   being transferred from one institution to another.  Meachum v. Fano, 427 U.S. 215, 223-225, 96

19   S. Ct. 2532, 2538 (1976); see Rizzo v. Dawson, 778 F.2d 527, 530 (9th Cir.1985) (prison

20   authorities may change a prisoner's "place of confinement even though the degree of

21   confinement may be different and prison life may be more disagreeable in one institution than in

22   another" without violating the prisoner's due process rights).

23              In support of plaintiff's allegations that defendant Williams subjected him to an

24   excessive risk of harm by failing to facilitate a cellmate reassignment, whether because Inmate

25   Duran identified himself as a Northerner and/or because plaintiff had a case factor that put him at

26   risk, plaintiff does not produce evidence in his opposition beyond his own expressed anxiety that

1   demonstrates that the particular inmate assigned to his cell posed a real threat to him.  Plaintiff

2   does not produce evidence that the cellmate, even assuming he was a "Northerner," rather than,

3   like plaintiff, an "Other," confronted, threatened, or harmed him.  It is also odd, if plaintiff means

4   to emphasize that he was at risk with his then current housing, why plaintiff attempts to belie

5   defendant Williams' credibility by alleging in his verified amended complaint that Lt. Herrera, on

6   February 8, 2006, told him that the information provided by defendant Williams about plaintiff's

7   safety was not credible, i.e., resulting in his subsequent Ad Seg placement.  AC, p. 15.   He also

8   states in his deposition that he was speculating but assumed that the information came from

9   defendant Williams that plaintiff's life was in danger on the yard.  Plaintiff's Dep. 53:13-17.

10   Perhaps this concern was more applicable to what happened during the Feb. 2, 2006, incident

11   (see immediately below).  Whether plaintiff's concern about this inmate was legitimate or not, he

12   does not sufficiently substantiate it to survive summary judgment as to this claim.

13            However, to the extent that defendant Williams is alleged to have placed plaintiff

14   at risk by yelling to him, in front of African American inmates, that plaintiff, a Puerto Rican

15   inmate, was asking for something that could particularly cause black inmates to be significantly

16   inconvenienced, leading to a violent, if limited, incident does implicate the Eighth Amendment.

17   As noted earlier, on this motion for summary judgment, all reasonable inferences that may be

18   drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

19   Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Defendants incorrectly contend that plaintiff

20   must show that defendant Williams made the statement knowingly and for the very purpose of

21   causing harm to plaintiff, assuming the accuracy of plaintiff's allegation that Williams yelled

22   (within the hearing of African American inmates)[8]: "So now you want to fuck the blacks out of

23

---

24        [8]  In his deposition testimony, uncited by any party, it appears that plaintiff believes that
     Inmate Socorro, who plaintiff states is classified, like himself, as an "Other," was a member of his
25   own ethnic group acting on behalf of those who had overheard defendant Williams yelling about
     plaintiff trying to disturb other inmates' housing and also as a result of Inmate Duran apparently
26   expressing dissatisfaction about being housed with plaintiff.  Plaintiff's Dep.: pp. 27-35.

their cell.  Just for you."   MSJ, Doc. # 61-1, p. 7.  The harm alleged in a failure to protect claim

does not have to rise to such a stringent level: "deliberate indifference entails something more

than mere negligence...[but] is satisfied by something less than acts or omissions for the very

purpose of causing harm or with knowledge that harm will result."  Hearns v. Terhune, 413 F.3d

1036, 1040 (9th Cir. 2005), quoting Farmer, supra, 511 U.S. at 835, 114 S. Ct. 1970.

Nor does defendant Williams meet the standard for entitlement to qualified

immunity on this claim.  In resolving a claim for qualified immunity the court addresses two

questions: (1) whether the facts, when taken in the light most favorable to plaintiff, demonstrate

that the officer's actions violated a constitutional right and (2) whether a reasonable officer could

have believed that his conduct was lawful, in light of clearly established law and the information

the officer possessed.  Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987).  Although

the Supreme Court at one time mandated that lower courts consider these two questions in the

order just presented, more recently the Supreme Court announced that it is within the lower

courts' discretion to address these questions in the order that makes the most sense given the

circumstances of the case.  Pearson v. Callahan, --- U.S. ---, 129 S. Ct. 808 (2009).

In this instance, the court has found that as to the first qualified immunity prong,

plaintiff has raised a genuine issue of fact as to whether or not defendant Williams violated his

Eighth Amendment rights by her action of yelling the statement ascribed to her in the

circumstances alleged to have been present.  As to the second prong, the court finds that no

reasonable officer could have found such inflammatory language to have been lawful in the light

of clearly established law and the information she must have possessed as a Facility 1

correctional sergeant in 2005 and 2006 at CSP-Sol[9] with respect to the sensitivity of inmate

housing.  Thus, defendant Williams does not show entitlement to summary judgment on this

claim.

---

[9]  See MSJ, Williams Dec., Doc. # 61-7, ¶ 1.

1        *Defendant Cortez –Deliberate Indifference re: Medical Needs*

2         As to any claim for unconstitutionally inadequate medical care against defendant

3 Cortez, plaintiff makes the following allegations in his verified amended complaint.  Following

4 the interview with Lt. Herrera concerning the inmate attack on him, plaintiff was returned to the

5 holding cage still in restraints, which had not been removed.  AC, p. 13.  After his hands had

6 started to go numb, plaintiff told defendant Cortez of his pain and discomfort but Cortez ignored

7 plaintiff's request to loosen the handcuffs.  Id.  When he could not get anyone to loosen the cuffs,

8 he began to kick his cage, after which a correctional officer returned and removed the too-tight

9 cuffs.  Id., at 13-14.   (Plaintiff does not clearly identify the C/O who removed his cuffs).  When

10 plaintiff asked to be taken to the clinic for a wrist injury from where the handcuffs had cut in,

11 defendant Cortez ignored plaintiff again.  Id., at 14.

12         Defendant Cortez moves for summary judgment on the inadequate medical care

13 claim because, he contends, plaintiff shows no evidence that this defendant acted with sufficient

14 culpability, ensuring that plaintiff received medical assistance and his cuffs were removed to

15 prevent further injury.  MSJ, pp. 2, 4, 8-10.

16        *Legal Standard for Eighth Amendment– Medical Deliberate Indifference Claim*

17         In order to state a § 1983 claim for violation of the Eighth Amendment based on

18 inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

19 deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

20 285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

21 serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

22 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

23 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

24 Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

25         A serious medical need exists if the failure to treat a prisoner's condition could

26 result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

that a prisoner has a serious need for medical treatment are the following:  the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.  However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.  Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense – subjective standard – disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at 1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837, 114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at 847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at 1981.  However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

1  Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

2  662 F.2d 1337, 1344 (9th Cir. 1981).

3        Moreover, a physician need not fail to treat an inmate altogether in order to violate

4  that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

5  1989).  A failure to competently treat a serious medical condition, even if some treatment is

6  prescribed, may constitute deliberate indifference in a particular case.  Id.

7        Additionally, mere delay in medical treatment without more is insufficient to state

8  a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

9  F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

10 no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

11 Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

12 1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends

13 to provide additional support for a claim of deliberate indifference; however, it does not end the

14 inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the

15 medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

16 needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

17 the defendant."  McGuckin, 974 F.2d at 1061.

18       Superimposed on these Eighth Amendment standards is the fact that in cases

19 involving complex medical issues where plaintiff contests the type of treatment he received,

20 expert opinion will almost always be necessary to establish the necessary level of deliberate

21 indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

22 may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

23 treatment he received equated with deliberate indifference thereby creating a material issue of

24 fact, summary judgment should be entered for defendants.  The dispositive question on this

25 summary judgment motion is ultimately not what was the most appropriate course of treatment

26 for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

1    criminally reckless.

2             It is undisputed that plaintiff claims that defendant Cortez was deliberately

3    indifferent to plaintiff's serious medical needs when Cortez initially ignored plaintiff's request to

4    loosen the cuffs on his wrists.  Plaintiff identifies no genuine dispute of fact as to the following

5    of defendants' undisputed facts: that after the inmate altercation, plaintiff was taken to a holding

6    cell, where he remained; that while in the holding cell, plaintiff yelled and kicked the cage until

7    defendant Cortez came into the office; that plaintiff informed defendant Cortez that the handcuffs

8    were causing him pain and discomfort.  MSJ, DUF, Doc. # 61-2, p. 4; Opp., PDF, Doc. # 65-3, p.

9    4.  Only with DUF # 23, related to this claim does plaintiff take minor issue: defendant Cortez

10   returned and evaluated plaintiff's handcuffs by placing a finger between the cuff and Perez's

11   wrist, and took off the handcuffs.  MSJ, DUF, Doc. # 61-2, p. 4, citing plaintiff's Dep.: 63:3-9,

12   Declaration of S. Cortez (Cortez Dec.) ¶ 3.   Plaintiff contends that defendant Cortez could not

13   actually place a finger between the cuff and plaintiff's wrist because the cuffs were on too tight.

14   Opp., PDF, Doc. # 65-3, p. 3.  It is troubling that the Cortez declaration cited in support of the

15   contention that defendant Cortez removed the handcuffs does not reference plaintiff's complaint

16   about the handcuffs or removing them at all.  However, plaintiff himself testifies to the

17   following, after kicking the cage for attention to his tight cuffs:[10]

18             A.  After that, Cortez shows up, and he says, "What's the
                problem?"  I said, "My cuffs are tight, you know what I mean,
19             these things."  So he checked it by trying to put his finger in
                between the cuff and my skin.  And he noticed that they were, in
20             fact, tight, so he took them off completely.

21   Plaintiff's Dep. 63:4-9.   Plaintiff also concedes this point in his opposition.  Opp., Doc. # 65-1,

22   p. 4.

23             In his opposition argument (which he signs under penalty of perjury) as well as his

24   deposition, plaintiff says that when he first asked defendant Cortez to loosen his cuffs that he did

25

26         [10]  See plaintiff's Dep. 57:13-63-2.

                                                    21

not do so and that only after he began kicking the cage did Cortez come and take them off.  Opp.,

Doc. # 65-1 p. 4, citing plaintiff's Dep: 55-64.  There was at least one other staff person who did

not respond to his request to see a supervisor about the cuffs and plaintiff approximates that he

was in the holding cell for some 30 or 40 minutes before the cuffs which were numbing his right

hand and turning it blue were removed altogether by defendant Cortez after plaintiff started

kicking the cage.  Plaintiff's Dep.: 55-63.  Plaintiff contends that he asked to be seen in the

medical unit so that his wrist injuries could be documented, but his pleas were ignored until

defendant Lozano came in with a can of mace (earlier plaintiff refers to it as OC spray).  Opp., p.

5.  Shortly thereafter, plaintiff was told to cuff up for medical, but instead he was led to Ad Seg.

Id.  Plaintiff testified that when defendant Cortez put the cuffs back on for the escort from the

holding cell that defendant Cortez did put the cuffs on loosely.  Plaintiff's Dep.: 67:8-17.  At the

point at which defendants Cortez and Cantu are alleged to have led plaintiff toward Ad Seg,

plaintiff's claim against these defendants transforms into an excessive force claim, set forth

following the claim against defendant Lozano.

   Defendants argue that the evidence demonstrates that defendant Cortez acted

within a reasonable amount of time to abate the pain and discomfort of the handcuffs.  MSJ,

Opp., Doc. # 61-1, pp. 9-10.  Plaintiff says virtually nothing within his response other than to

concede he is alleging deliberate indifference by Cortez when he failed to initially take off the

cuffs.  The court notes that more than simply loosening the cuffs which plaintiff requested,

according to plaintiff's own testimony, defendant Cortez removed the handcuffs altogether.

Even accepting that the handcuffs were too tight and caused him some pain, numbness or other

discomfort for up to half an hour or so, plaintiff simply does not raise a genuine issue of material

fact as to this specific claim against defendant Cortez that rises to the level of an Eighth

Amendment violation, and the court finds that the motion for summary should be granted as to

this claim.

\\\\\

1        *Defendant Lozano*

2        Plaintiff alleges in the verified amended complaint as to this defendant that when

3   he began to kick the holding cage again for attention after defendant Cortez ignored him,

4   defendant Lozano ran in with a can of O.C. spray pointed at plaintiff, threatening to spray him if

5   he did not stop.  AC, p. 14.  Defendant Lozano refused plaintiff's request to be seen by medical

6   to document plaintiff's wrist injury and instead was only concerned as to who had removed the

7   cuffs and why.  Id.  Fifteen minutes later, defendants Cortez and Cantu came and told plaintiff to

8   "cuff up" for an escort to medical.  Id.

9        Although plaintiff purports to simply and generically state that he disputes all

10  facts alleged by defendant Lozano to be undisputed, he offers no specificity or support for that

11  position.   In his opposition, plaintiff states that he must rest on the allegations of his verified

12  amended complaint with regard to his claims against this defendant as this defendant failed to

13  respond to plaintiff's interrogatories because he (Lozano) filed for a protective order and has

14  done nothing to comply with the discovery process.  Opp., Doc. # 65-1, pp. 9-10.  Plaintiff also

15  believes that the reports speak for themselves with regard to the Lozano's claims that he offered

16  plaintiff medical attention.  Id. at 10.  Plaintiff does not precisely identify what reports he means

17  or specify what they contain that supports plaintiff's position.

18       Plaintiff's bare assertion concerning defendant Lozano's alleged failure to respond

19  to plaintiff's discovery requests does not implicate Fed. R. Civ. P. 56(f) for a continuance of this

20  motion, as he neither seeks a continuance or makes the requisite showing in a supporting

21  affidavit for same.   Further, the court's review of the case docket demonstrates that plaintiff

22  never filed a motion to compel discovery responses as to this (or any other defendant).  While he

23  made a brief reference to defendant Lozano's alleged failure to provide discovery responses in

24  objections that plaintiff attached to a later motion seeking "clarification" (see above), plaintiff

25  never let the court know by way any appropriate vehicle, nor has he even presented evidence by

26  even the copy of a proof of service that he ever served this defendant with discovery requests or,

23

if so, when he did.  The only form of a protective order was filed on November 5, 2008 (Doc. #
27), when the undersigned granted, inter alia, defendant Lozano's request not to be required to
serve discovery responses until after adjudication of defendants' motion to dismiss.[11]  Thereafter,
by order filed on May 6, 2009 (Doc. # 46), defendants' request for an extension of time to serve
discovery responses upon plaintiff was denied.  On August 25, 2009 (doc. # 53), defendants were
directed to show proof of having served by May 11, 2009, their responses to plaintiff's discovery
requests in response.  When defendants thereafter only showed proof of having served responses
to plaintiff's second request for production of documents, the court ordered the defendants to
show proof that all the discovery responses had been served on plaintiff timely.  See order, filed
on September 2, 2009 (doc. # 55).  On September 9, 2009 (doc. # 57), defendants filed copies of
verifications and proofs of service of the second set of interrogatory responses for defendants
Williams, Cantu and Cortez, respectively.  Defendants maintain in their amended response that
the discovery that plaintiff served on April 2, 2009, was his set two of requests for production of
documents and his set two of interrogatories for defendants Williams, Cantu and Cortez.
Plaintiff provides no evidence, as noted, of ever having served defendant Lozano with discovery
requests.  While it is evident that plaintiff did, indeed, serve a set one of interrogatories upon
defendants Williams, Cantu and Cortez because he has lodged the interrogatory responses to both
set one and set two as to each of these defendants in their entirety in support of his opposition,
plaintiff simply has not shown that he served interrogatories upon defendant Lozano nor, if he
did, has he proceeded in the appropriate way to assure that he received responses from Lozano.
In addition, in the defendants' earlier response dated August 25, 2009 (doc. # 54), defendants
attached a letter to plaintiff wherein they identify plaintiff's discovery requests as having been
\\\\\

---

[11]   When it was later determined that defendant Lozano had failed to file a response to the
amended complaint, he was ordered to show cause by order filed on Jan. 8, 2009 (Doc. # 30) and
thereafter discharged the order as noted on Jan. 26, 2009 (Doc. # 32), and filed an answer.

served on April 2, 2009.[12]  As plaintiff failed to file a motion to compel or an appropriate
affidavit in support of a request for a continuance (which he also does not make), or even a copy
of a proof of service showing when he served defendant Lozano with discovery requests, the
court will not grant any such continuance.

Notwithstanding, plaintiff's blanket assertion that he is disputing all of defendant
Lozano's undisputed facts is not sufficiently supported.  In DUF # 16, defendants state that
defendant Lozano threatened to use pepper spray on plaintiff while plaintiff was in a holding cell
but did not do so.  MSJ DUF, Doc. # 61-2, p. 3, citing AC, 3i:12; Declaration of J. Lozano
(Lozano Dec.) ¶ 6.  This fact is undisputed in the record.  As to DUF # 17, that defendant Lozano
told plaintiff he was going to see medical, and to just "hang tight" is supported by plaintiff's own
testimony.  Id., citing plaintiff's Dep. 67: 2-16.  At DUF # 18, defendants assert that after being
informed by plaintiff of his request for medical attention, defendant Lozano requested that
defendants Cortez and Cantu escort plaintiff to the medical clinic.  Id., citing Lozano Dec. ¶ 5.
Plaintiff produces no specific evidence in opposition to refute this, but it can be inferred that he
disputes this based on what occurred when he maintains that he thought he was being escorted to
medical but was then led toward Ad Seg, resulting in the incident which he now alleges arose
from a use of excessive force by defendants Cortez and Cantu.  DUF # 19 states that fifteen
minutes after plaintiff spoke with defendant Lozano, plaintiff was escorted by defendants Cortez
and Cantu to see medical staff; this fact is amply supported, as defendants note, by plaintiff's
verified amended complaint.  Id., AC, pp. 3i: 12-19.  While he also posits therein that defendant

_____

[12]  Plaintiff also makes a broad claim, as to his allegations not limited to defendant Lozano,
that he was subjected to false write-ups and has been transferred out of CSP-Solano in retaliation and
therefore cannot get witness declarations from other inmates or staff "who may have been a witness."
Opp., p. 6, Doc. # 65-1, p. 6.  Retaliation claims are not at issue within this action, nor does plaintiff
set forth any specifics with regard to his claims of false write-ups.  He also does not  set forth who
might have been witnesses or make any offer of proof as to what any potential witness might have
testified to.  Finally, he does not present any evidence that he made any effort to procure any witness
declarations before or since his transfer, merely positing that his transfer rendered him unable to do
so.

1    Lozano was only concerned with who had removed plaintiff's cuffs and refused his request to go

2    to medical, this is somewhat undermined by his subsequent testimony that Lozano told plaintiff

3    he was going to medical as set forth above in support of DUF # 17.

4           In any event, as defendants argue, to the extent that plaintiff's claim of an Eighth

5    Amendment violation in the form of excessive force arises from defendant Lozano's having

6    threatened plaintiff with a can of OC pepper spray as plaintiff kicked at his cage, the claim fails

7    as a matter of law because it was at most a mere threat of force.  Reply, Doc. # 68, p. 2.  It was

8    also undisputedly in response to plaintiff's kicking the holding cell he was in.  Threats of bodily

9    injury are insufficient to state a claim, because a mere naked threat is not the equivalent of doing

10   the act itself.  See Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987).  Nor does plaintiff raise a

11   genuine issue of material fact in his conflicting versions of how defendant Lozano reacted to his

12   request to receive medical attention to document the injuries to his wrist from the handcuffs.

13   There is no dispute that plaintiff testified that plaintiff was going to receive medical attention and

14   that fifteen minutes later he was escorted out of the cage for that apparent purpose.  Moreover,

15   plaintiff provides no medical evidence that the injuries to his wrists constituted a medical need

16   that was objectively serious, and that defendant Lozano possessed a sufficiently culpable state of

17   mind.  Wilson v. Seiter, supra, 501 U.S. at 299, 111 S. Ct. at 2324; McKinney v. Anderson, 959

18   F.2d 853 (9th Cir. 1992) (on remand).   In fact, plaintiff repeatedly states that he wanted the

19   injuries documented, rather than averring that he needed immediate treatment.  The motion for

20   summary judgment should be granted as to defendant Lozano.

21                    *Defendants Cantu and Cortez-Excessive Force*

22          Plaintiff alleges that after defendants Cantu and Cortez told him to "cuff up" for

23   medical, instead they led him to Ad Seg; when plaintiff stopped to ask why, defendants Cantu

24   and Cortez took him down; plaintiff could not break his fall with his hands cuffed behind him.

25   AC, p. 15.  Plaintiff hit the ground with the force of the two defendants on top of him and his

26   face hit the concrete.  Id.  Plaintiff suffered head and knee injuries over and above the previous

                                              26

1   wrist injury from the cuffs.  Id.  Plaintiff's placement in Ad Seg on February 2, 2006, occurred as

2   a result of the above incident and the alleged mutual combat incident with Inmate Socorro.  Id.

3          Defendants maintain there is no material dispute regarding the reasonableness of

4   the force used against plaintiff.  MSJ, Doc. # 61-1, p. 11.  Defendants rely for support for this

5   argument on a video-taped interview of plaintiff the day after the escort.  Id. & see discussion

6   below.

7              *Eighth Amendment Legal Standard-Excessive Force*

8          "[W]henever prison officials stand accused of using excessive physical force in

9   violation of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a

10  good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

11  Hudson v. McMillian, 503 U.S. 1, 6-7,112 S. Ct. 995, 999 (1992), citing Whitley v. Albers, 475

12  U.S. 312, 106 S.Ct. 1078 (1986).  When determining whether the force was excessive, we look to

13  the "extent of the injury..., the need for application of force, the relationship between that need

14  and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and

15  'any efforts made to temper the severity of a forceful response.'" Hudson, supra, at 7, 112 S. Ct.

16  at 999.

17         While de minimis uses of physical force generally do not implicate the Eighth

18  Amendment, significant injury need not be evident in the context of an excessive force claim,

19  because "[w]hen prison officials maliciously and sadistically use force to cause harm,

20  contemporary standards of decency always are violated."  Hudson, supra, at 9, 112 S. Ct. at 1000,

21  citing Whitley, at 327, 106 S.Ct., at 1088.

22         In DUF # 24, defendants state that defendants Cantu and Cortez escorted plaintiff

23  to the medical clinic on February 2, 2006.  MSJ DUF, Doc. # 61-2, p. 4, citing AC, 3i: 20-28; 3j:

24  1-7; Cortez Dec., ¶ 2; Declaration of D. Cantu (Cantu Dec.) ¶ 2.  However, although these

25  defendants undisputedly ultimately took plaintiff to the infirmary following the incident at issue,

26  plaintiff has produced sufficient evidence in the form of copies of a rules violation hearing and

1   incident reports of the event[13] that these defendants turned toward Building 10, the Ad Seg unit,

2   and away from the medical unit during the initial escort. See Opp., Doc. # 66, pp. 3-15.[14]  In

3   response to plaintiff's interrogatory no. 5, set one, defendant Cortez straightforwardly states that

4   he and Cantu were escorting plaintiff to Ad Seg [i.e., not toward the medical clinic] from the

5   Facility 1 Center Complex holding cell # 1, and that as plaintiff exited to Facility 2, he stopped

6   walking; after he was ordered to keep walking toward Building 10, he made an immediate left

7   turn, pulling away from defendants Cortez and Cantu. Id., pp. 28-29.  Thus, it is somewhat

8   disingenuous for defendants to say in a purportedly undisputed fact that these defendants took

9   plaintiff to the medical clinic in a manner to imply that they were headed that way from the

10  outset.  In their declarations both defendants Cortez and Cantu state that they were informed,

11  without indicating how or by whom, that a nurse was present in the Ad Seg unit to provide

12  plaintiff with medical clearance before his placement in Ad Seg.  MSJ, Cortez Dec., Doc. # 61-4,

13  ¶ 5; Cantu Dec., Doc. # 61-3, ¶ 5.  Plaintiff maintains that he was not informed that medical was

14  waiting in Ad Seg to clear him because that is never done.  Opp., Doc. # 65-1, p. 11.  It appears

15  safe to say that had such information been conveyed to him and assuming it was true, it may have

16  obviated the incident during the escort.  These defendants also declare that once they arrived at

17  Facility 2, "instead of turning left for the primary medical clinic, we moved right towards

18  Administrative Segregation where [plaintiff] was going to have his medical clearance.  At this

19  point, [plaintiff] stopped and resisted the escort, saying he was going to medical."  MSJ, Cortez

20

21  _____

22  [13]   Although unauthenticated, these documents could be made admissible at trial; nor do
defendants challenge their authenticity.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003)

23  (evidence which could be made admissible at trial may be considered on summary judgment); see
also Aholelei v. Hawaii Dept.of Public Safety, 220 Fed. Appx. 670 (9th Cir. 2007).

24  [14]   For example, in defendant Cantu's Feb. 9, 2006, Rules Violation Report of the Feb. 2,
2006, describing the incident, it is stated that plaintiff began resisting at the point that he was being

25  led to Building 10 [Ad Seg]; it is also true that the report states that immediately after the incident,
plaintiff was escorted to the infirmary.  Opp., Doc. # 66, p. 3.  Defendant Cortez describes the

26  incident similarly.  Id., p. 4.

Dec., Doc. # 61-4, ¶ 6[15]; Cantu Dec., Doc. # 61-3, ¶ 6.   Defendant Cantu declares that when

plaintiff resisted and stopped abruptly his hand was on plaintiff's right bicep to maintain control,

while defendant Cortez avers that his hand was on plaintiff's left bicep for the same reason and

that each fell "landing on top of him with [their] body weight."   MSJ, Cortez Dec., Doc. # 61-4, ¶

7; Cantu Dec., Doc. # 61-3, ¶ 6.   Plaintiff maintains that the defendants, while escorting him to

what he believed to be medical, did use excessive force on him, pushing him to the ground with

one defendant with his knee on plaintiff's upper back and another with his knee on his lower

back.  Opp., plaintiff's Dec., Doc. # 65-2, ¶ 7.  He re-asserts that with his hands cuffed behind

him, he posed no threat, but simply stopped walking because he was not informed of the plan to

take him to Building 10, Ad Seg, instead of to the medical unit as he was first informed.  Id., ¶ 8.

Plaintiff also points to what he believes is a discrepancy between the current declarations of

defendants Cortez and Cantu and the RVR report of what happened, wherein defendant Cantu

stated that plaintiff "pulled violently to the left" as he said that he did not want "to go to 10

Building."   Opp., plaintiff's Dec., Doc. # 65-1, p. 11, Doc. # 66, p. 3[16]  He further declares that,

as a result of defendants' "excessive force," he sustained an injury to his forehead and his wrist

and a skinned knee that was not noted by the nurse on the 7219 form (a form that plaintiff does

not appear to have produced in his opposition papers).

It is undisputed that plaintiff, in a video-taped interview with non-defendant Lt.

Herrera, on Feb. 3, 2006, the day after the incident involving defendants Cortez and Cantu,

plaintiff was unable to name the officers who had escorted him the day before but did state that

what had occurred the day before was an accident.  Lt. Herrera states that plaintiff had resisted

staff by pulling away and also that in a 7219 report following the incident, a reddened area to the

---

[15]   Defendant Cortez's declaration, apparently inadvertently, makes a reference to "Officer Cortez and I" in ¶ 6, when he obviously means "Officer Cantu and I."

[16]   In the supplemental portion of the RVR, however, defendant Cortez describes plaintiff's movement after he stopped walking, following an order to continue, as instead making "an immediate left."  Opp., Doc. # 66, p. 4.

left forehead had been noted and that there were no visible signs of injury.   Plaintiff does not object to any portion of the statement.  In the video recording, which the court has reviewed, plaintiff has a small reddened area on his left forehead and he says his head hit the ground. Plaintiff states that he was treated and provided with a 75-milligram shot of Benadryl following the incident.   When asked, he also indicates that he was not alleging inappropriate or excessive use of force and that "it was an accident."

However, plaintiff maintains that when he reviewed the reports of the incident and replayed it in his head, he came to realize that it had not been an accident and to believe that the force was maliciously and sadistically applied.  Id., ¶ 9.  It is undisputed that plaintiff originally believed that these defendants had nothing against him during the escort (DUF # 27).

In his deposition, plaintiff states:

Q.  And were you truthful during that video recording?
A.  Was I truthful?
Q.  Yeah.
A.  Yeah.  I told them what had happened.  And I told them that they banged my head.  And at the time, okay, he asked me if I was going to pursue anything against them, and I told him no because I thought it had been an accident.
But then after being put in my cell and talking to other people, they told me, no, that's not an accident the way they treated you.  The way they slammed you down, that's not an accident, that's something else, that was excessive force.

Plaintiff's Dep. 95: 7-20.

Q.  But your original inclination is that it was an accident?

A.  Well, my original thing was because, like I said, I didn't have anything against these officers, and I didn't think they would have anything against me.  Okay.  So I thought it was, you know, it was just something that happened.

Q.  Okay.

A.  All right.  But after further, like I said, after further talking to some other people, and after further playing the thing over and over in my head again, I realized, no, that should have never happened that way.  That wasn't an accident, that was something that they deliberately did.

Plaintiff's Dep. 96: 4-17.

30

1         Plaintiff therefore filed a grievance about the incident on Feb. 16, 2006.  Opp.,

2  Doc. # 65-1, p. 6.  However plaintiff came to his revised version of what had occurred, that

3  indeed he was subjected to excessive force during the escort with defendants Cortez and Cantu, it

4  is not in dispute that both defendants Cantu and Cortez landed with their full body weight on top

5  of plaintiff.  This simultaneous "falling" on plaintiff is more than a little odd, and raises an

6  inference in plaintiff's favor.   Although plaintiff, whether misinformed or not as to his

7  destination, should arguably not have stopped or pulled away as he was being escorted by

8  defendants Cantu and Cortez, and even though, at most, he appears to have sustained minimal

9  injuries, plaintiff does raise a genuine issue of material fact as to whether what occurred

10  warranted both defendants landing on top of his handcuffed body.   Even though his claim may

11  be weakened by his own initial assessment that it was an accident (in an interview, although

12  close in time to the incident, evidently not conducted with plaintiff under oath), that his

13  perception of the event altered in light of further consideration or other circumstances does not

14  wholly undermine it.

15         Thus, on the question of qualified immunity, as to the first prong, the

16  court finds that taking the facts in the light most favorable to plaintiff, it has been demonstrated

17  that defendants Cantu and Cortez violated plaintiff's Eighth Amendment right not to be subjected

18  to excessive force.  As to the second prong, whether a reasonable officer could have believed that

19  his conduct was lawful, in light of clearly established law and the information the officer

20  possessed, Anderson v. Creighton, supra, 483 U.S. 635, 107 S.Ct. 3034, defendants' contention

21  that it is undisputed that they lacked the necessary intent to cause petitioner harm during the

22  escort (MSJ, Doc. # 61-1, p. 13, Reply, Doc. # 68, p. 5) appears to be largely based on what

23  petitioner stated in his video interview and does not take adequate account of his revised

24  perceptions which he has declared under penalty of perjury.  The summary judgment motion as to

25  this claim should be denied.

26  \\\\\

Accordingly, IT IS ORDERED that:

1.  Plaintiff's motion for sanctions, filed on December 29, 2009 (doc. # 69), is denied;

2.  Plaintiff's motion for clarification, filed on December 30, 2009 (doc. # 70), primarily construed as a motion for his belatedly received objections to the August 25, 2009, findings and recommendations to be considered following adoption of those findings and recommendations by order filed on Nov. 6, 2009, is denied; and

3.  Plaintiff's motion to treat defendants' failure to file an opposition to plaintiff's motion for sanctions as non-opposition, filed on April, 5, 2010 (doc. # 72), is denied.

IT IS RECOMMENDED that defendants' motion for summary judgment, filed on October 7, 2009 (docket # 61), be denied in part and granted in part:

1.  As to defendant Williams, DENIED as to plaintiff's claim that Williams violated the Eighth Amendment when she arguably helped precipitate an inmate attack upon plaintiff by allegedly yelling in full hearing of other inmates that plaintiff was trying to interfere with their housing, but GRANTED as to any other claim against defendant Williams;

2.  GRANTED as to defendant Lozano;

3.  DENIED as to plaintiff's claim of excessive force during his escort against defendants Cantu and Cortez;

4.  GRANTED as to any other claim against defendant Cortez; and

5.  This matter proceed to trial only, as identified specifically above, on the failure to protect claim against defendant Williams and the excessive force claim against defendants Cantu and Cortez.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

32

1  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

2  shall be served and filed within fourteen days after service of the objections.  The parties are

3  advised that failure to file objections within the specified time may waive the right to appeal the

4  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

5  DATED: 07/20/2010

/s/ Gregory G. Hollows

6  _____

7  GREGORY G. HOLLOWS
   UNITED STATES MAGISTRATE JUDGE

GGH:009
8  pere2090.msj

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26